IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

EARLENE PETERSON
KIMMA GUREL
MONICA VIELLETTE,
Plaintiff-Appellees

v.

WILLIAM P. BARR, ATTORNEY GENERAL, et al.,
Defendants-Appellants

No. 20-2252

## EMERGENCY MOTION TO SUMMARILY STAY OR VACATE PRELIMINARY INJUNCTION BARRING THE EXECUTION OF DANIEL LEWIS LEE

DAVID M. MORRELL
  *Deputy Assistant Attorney General*

JOSH J. MINKLER
  *United States Attorney*

SOPAN JOSHI
  *Senior Counsel to the Assistant*
  *Attorney General*

PAUL R. PERKINS
  *Special Counsel*

MELISSA N. PATTERSON
AMANDA L. MUNDELL
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7236*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-3469*
  *amanda.l.mundell@usdoj.gov*

## INTRODUCTION AND SUMMARY OF ARGUMENT

Yesterday, the district court enjoined the federal government from carrying out an execution on an entirely unprecedented basis: certain witnesses' unwillingness to travel to the prison to attend that execution. The court based that injunction on its view that the combination of the Federal Death Penalty Act (FDPA), the Administrative Procedure Act (APA), and Arkansas law required the government to consider these witnesses' scheduling preferences in light of the coronavirus pandemic when choosing an execution date. The capital sentence at issue here—imposed for the murder of an eight-year-old and her parents during a robbery to fund a white-supremacist movement—has been repeatedly upheld by federal courts, and the inmate's own efforts to halt its implementation have very recently been rejected by this Court and the Supreme Court. The preliminary injunction misconstrues both federal and state law and has no basis in equity. This Court should stay or vacate it immediately to permit the government to proceed with the execution of Daniel Lewis Lee, as scheduled, on 4:00 p.m. E.D.T. this Monday, July 13, 2020.

Plaintiffs are certain family members of Lee's victims who had planned to attend his execution even though they oppose it. The execution was originally scheduled for December 2019; after a preliminary injunction entered by another court was lifted in June 2020, the Bureau of Prisons (BOP) promptly rescheduled the execution for July 2020. Plaintiffs contend that this rescheduling decision burdens their ability to attend the execution, arguing that attendance could risk their health

given the COVID-19 pandemic. Plaintiffs sought a declaration that the government's choice of a date was arbitrary and capricious, and an order indefinitely delaying Lee's execution under the APA until a COVID-19 treatment or vaccine has been developed.

The district court granted their motion and preliminarily enjoined the government from carrying out Lee's execution "on July 13, 2020, or on any future date," pending further court order. A14.[1] The court plainly erred on the merits. The selection of an execution date is committed to the unreviewable discretion of the BOP Director. And even if that choice were judicially reviewable, plaintiffs' challenge would fail, since a designated execution witness does not fall within the zone of interests protected by the FDPA or any other applicable law. Indeed, the district court did not dispute these general propositions.

Instead, the court manufactured an argument plaintiffs never advanced—namely, that Arkansas law provides witnesses like plaintiffs a right to attend executions, and that the FDPA and APA thus required BOP to consider their availability when scheduling an execution date. The court's sua sponte assertion of this theory is itself sufficient basis to stay or summarily vacate the injunction; moreover, the theory is entirely inconsistent with both the FDPA, precedent, and Arkansas statute on which it is based.

---

[1] The order granting the preliminary injunction, Dkt. 20, is included as an addendum to this motion and denominated A_.

Even if the Court were to review the government's decision regarding an execution date, plaintiffs cannot establish that it was arbitrary or capricious or otherwise contrary to law. BOP's decision to promptly reschedule the execution after the stay was lifted complies with the applicable federal regulation. Neither law nor logic requires BOP to consider the availability and travel preferences of those attending the execution when scheduling it. And, as the district court itself recognized (but improperly disregarded), BOP has taken robust measures to minimize the risk to plaintiffs of exposure to COVID-19, while still retaining operational safety and security.

Finally, even apart from the merits, the balance of equities strongly favors a stay. The Supreme Court has repeatedly emphasized the important public interest in the timely implementation of capital sentences. Although plaintiffs' interests as family members of Lee's victims are worthy of serious consideration (which BOP has provided), their concerns do not outweigh the public interest in finally carrying out the lawfully imposed sentence in this case, particularly given the lengthy delay that has already occurred and the brutality of Lee's crimes.

As required by Federal Rule of Appellate Procedure 8(a)(1), the government filed a motion for stay pending appeal in district court on July 10, 2020, which the court promptly denied. *See* Dkt. 28, 29. Plaintiffs oppose this motion. Given that the district court entered its injunction less than 72 hours before Lee's scheduled

3

execution, the government intends to file an emergency motion in the Supreme Court later today in the absence of relief from this Court.

## STATEMENT

### A.     Background

The capital sentence implicated here was imposed twenty years ago. Lee and his co-defendant murdered a family, including an eight-year-old girl, by duct-taping plastic bags over their heads, weighting the bodies with rocks, and throwing them in a bayou during a robbery to fund a white-supremacist racketeering organization. *In re FBOP Execution Protocol Cases* (*Execution Protocol Cases*), 955 F.3d 106, 127 (D.C. Cir. 2020) (Katsas, J., concurring). Just yesterday, this Court deemed Lee's latest attempt to obtain post-conviction relief "frivolous." *Lee v. Watson*, No. 20-2128, slip op. 6 (7th Cir. July 10, 2020).

In federal executions in 2001 and 2003, the government employed a three-drug lethal-injection protocol. *See Execution Protocol Cases*, 955 F.3d at 110 (per curiam). However, "a long and successful campaign of obstruction by opponents of capital punishment" resulted in the unavailability of one of those drugs by 2011. *See id.* at 128 (Katsas, J., concurring). Faced with the problems of drug acquisition, the government "took time to study the successful track record of pentobarbital" before adopting an execution protocol utilizing it. *See id.*

The regulations governing federal executions afford the BOP Director broad discretion to designate an execution date and time. *See* 28 C.F.R. § 26.3(a). "If the

4

date designated for execution passes by reason of a stay of execution, then a new date shall be designated promptly by the Director of the Federal Bureau of Prisons when the stay is lifted." *Id.* Upon BOP's adoption of the protocol in July 2019, it scheduled the executions of several inmates, including Lee, for December 2019. On Lee and other inmates' motion, the District Court for the District of Columbia entered a preliminary injunction, *see* Case No. 1:19-mc-00145 (D.D.C.), Dkt. Nos. 50, 51, which the D.C. Circuit vacated, *see Execution Protocol Cases*, 955 F.3d at 108–13 (per curiam). On June 15, 2020, shortly after the D.C. Circuit issued its mandate and thereby lifted the injunction, the government rescheduled Lee's execution for July 13, 2020 and promptly notified potential witnesses (including plaintiffs) of the date. *See Hartkemeyer v. Barr*, No. 2:20-cv-00336 (S.D. Ind.), Dkt. 51-1, at 2 ("Winter Decl.").[2] On June 29, 2020, the Supreme Court denied Lee and the other inmates' petition for a writ of certiorari and their stay request. *See Bourgeois v. Barr*, 2020 WL 3492763, at *1 (U.S. 2020) (mem.).

Since March 2020, BOP has taken steps to respond to the COVID-19 outbreak. BOP first issued a "Shelter in Place" order, suspending all visitations. *See*

---

[2] Plaintiffs unsuccessfully sought to intervene in *Hartkemeyer* before filing this action. Their motion for a preliminary injunction nevertheless "incorporate[d] by reference and join[ed] the arguments on likelihood of success of the APA [arbitrary and capricious] claim made by [Rev.] Hartkemeyer." Dkt. 3, at 3. For purposes of this motion, the government thus refers to the APA arguments made by Rev. Hartkemeyer, and the responsive declaration entered in that case, as though presented here. *See id.*; Dkt. 10, at 5.

https://www.bop.gov/locations/institutions/tha/. Then, once BOP rescheduled executions, it took additional precautions to reduce the possible spread of COVID-19 in connection with execution proceedings. *See* Winter Decl. at 2-4. Among these: all BOP staff must wear face masks and pass a temperature check and symptom screening each day upon arrival. *Id.* at 2. On the day of Lee's execution, BOP staff plans to transport plaintiffs separately to the prison complex, provide plaintiffs with personal protective equipment (PPE), and escort them to a staging area allowing for social distancing. *Id.* at 2–3. Only plaintiff Veillette has requested to view Lee's execution, and BOP will segregate her in a witness room with two other witnesses with access to PPE, and some BOP staff members, who will be wearing masks. *Id.* at 3.

### B.    District Court Proceedings

Plaintiffs filed suit to enjoin Lee's July 13 execution date, arguing that BOP's decision to reschedule executions during the COVID-19 violated the APA. Case No. 2:20-cv-00350 (S.D. Ind.), Dkt. 3, at 3.[3] Plaintiffs requested that the district court prohibit BOP from carrying out the execution indefinitely, "until treatment or a vaccine [for COVID-19] is available." Dkt. 1, at 29.

On July 10, 2020, the district court granted plaintiffs' motions for a preliminary injunction, concluding that BOP's scheduling of Lee's execution for July 13 was

---

[3] Unless otherwise noted, docket citations herein are to district court proceedings below.

6

arbitrary and capricious. A1-14. The court reasoned: (1) that the FDPA cabined the government's discretion to select an execution date because it required the government to follow Arkansas law regarding execution witnesses; and (2) that BOP failed to explain how its rescheduling decision properly accounted for plaintiffs' rights as witnesses or protected them from COVID-19 exposure. *See* A6-11. The court also determined that plaintiffs' asserted harms outweighed the governmental and public interest in timely executing Lee. *See* A12–14.

## ARGUMENT

This Court should promptly stay or summarily vacate the unprecedented preliminary injunction entered by the district court on an unpresented and uncabined theory regarding execution-witness rights. The propriety of a stay pending appeal turns on "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 426 (2009) (quotation marks omitted). That standard is easily met here, where plaintiffs cannot succeed on the merits of their novel and sweeping theory that their unwillingness to attend someone else's execution on the chosen date provides a basis to halt that execution. And although the government recognizes plaintiffs' interests in attending Lee's execution, their concerns do not rise to the level of irreparable harm needed to outweigh the larger public interest—including the interests

7

of other loved ones of Lee's victims—in the timely implementation of a lawfully imposed capital sentence.

## I.    Plaintiffs Cannot Establish A Likelihood Of Success On The Merits Of Their APA Claims.

The district court accepted plaintiffs' novel theory that the judiciary may prevent the government from carrying out a lawful capital sentence at the request of those permitted to attend a particular execution. That was error; plaintiffs have no APA cause of action to challenge the government's choice of an execution date. And even if they did, the government's decision to promptly reschedule Lee's execution after an earlier stay was lifted was not arbitrary and capricious.

### A.    Plaintiffs Have No Cause Of Action Under The APA.

Neither the APA nor the FDPA provides a basis for anyone to challenge the selection of an execution date, a matter committed to the government's discretion. This is equally true of witnesses permitted to attend an execution, who do not fall within the zone of interests protected by the FDPA. The district court did not contest either of these principles in general, but instead created an exception where—in the court's view—the law of the state of conviction entitles a particular type of witness to attend the execution. This sua sponte theory misconstrues both the FDPA and state law.

1. The APA does not extend judicial review to agency actions that Congress committed to agency discretion by law. *See* 5 U.S.C. § 701(a)(2); *Heckler v. Chaney*, 470

8

U.S. 821, 829–33 (1985).  The government's choice of execution date is such an action.  "When deciding whether a decision is committed to agency discretion," the Court "first review[s] the applicable statutes and regulations."  *Menominee Indian Tribe of Wis. v. Environmental Protection Agency*, 947 F.3d 1065, 1072 (7th Cir. 2020).

The FDPA directs that "a person who has been sentenced to death" must be "committed to the custody of the Attorney General until exhaustion" of his appellate and post-conviction proceedings; it further directs that "[w]hen the sentence is to be implemented, the Attorney General shall release the person" to the U.S. marshal, "who shall supervise implementation of the sentence in the manner prescribed by the law of the State in which the sentence is imposed."  *See* 18 U.S.C. § 3596(a).  The statute therefore requires the Attorney General to retain custody of a defendant until his appellate and post-conviction proceedings are exhausted, but it places no other limits on the Attorney General's discretion to determine "when" the execution will be carried out.  *Id.*

The applicable regulations, in turn, delegate responsibility for execution scheduling to the BOP Director, 28 C.F.R. § 26.3, and provide that unless a court has ordered otherwise, the Director shall designate an execution date that is "no sooner than 60 days from the entry of the judgment of death."  28 C.F.R. § 26.3(a)(1).  The only other limitations the regulations contain are either designed to afford notice to the inmate—*i.e.*, that the inmate will generally be given 20 days' notice, *id.* § 26.4(a)—

or to ensure that a new execution date is "designated promptly" after a postponement, *id.* § 26.3(a)(1).

Thus, beyond these requirements setting out minimum post-judgment and notice periods, the statute and regulation do not constrain the Attorney General's ability to choose an execution date. Neither the FDPA nor its implementing regulations impose "concrete limitations … on the agency's exercise of discretion," *Drake v. FAA*, 291 F.3d 59, 70 (D.C. Cir. 2002), or provide any "judicially manageable standards" to judge "how and when" BOP schedules executions, *Heckler*, 470 U.S. at 830. This lack of specification is unsurprising in light of the historic flexibility in setting particular execution dates. *See* 7 U.S. Op. Atty. Gen. 561, 562 (1855) (noting that sometimes the President fixed the date of execution and sometimes the sentencing court provided one); *Holden v. Minnesota*, 137 U.S. 483, 495–96 (1890). It also accords with the practical reality that the selection involves substantial planning across multiple government entities. *See, e.g.*, Dkt. 28-1 (BOP declaration). No source of law imposes any standard by which the judiciary could review the Attorney General's discretion to carry out federal executions on a timeline comporting with the Executive Branch's capabilities and priorities, much less whether the date is reasonable in light of competing scheduling and travel preferences of potential attendees.

2. Even if plaintiffs' claim were reviewable under the APA, their alleged injuries are not within the zone of interests protected by any federal statute or

10

regulation.  *See* 5 U.S.C. § 702 (permitting judicial review only if a person is "aggrieved by agency action within the meaning of a relevant statute"); *Air Courier Conference of Am. v. Postal Workers*, 498 U.S. 517, 523-24 (1991) (plaintiff must "establish that the injury he complains of … [is] protected by the statutory provision whose violation forms the legal basis for his Complaint").  Although the government endeavors to facilitate attendance by victims' family members, plaintiffs do not even arguably have a right under the FDPA to demand that the government schedule executions when plaintiffs are willing or able to attend.  Indeed, the FDPA does not mention witnesses at all.

Plaintiffs have no arguable rights under the applicable federal regulations either. The only regulation on which plaintiffs relied, 28 C.F.R. § 26.4, merely specifies who *may* attend an execution.  *See Entertainment Network, Inc. v. Lappin*, 134 F. Supp. 2d 1002, 1007 (S.D. Ind. 2001) (noting that 28 C.F.R. § 26.4 "specif[ies] who shall be *permitted* to attend federal executions") (emphasis added).  It does not require their attendance for the execution to move forward.  Were it otherwise, any of the permissible witnesses the regulation identifies—including "friends or relatives" *of the condemned*, 28 C.F.R. § 26.4(c)(3)(iii)—could obstruct an execution by asserting a scheduling conflict.  Plaintiffs' reliance on § 26.4(c)'s list of persons who "shall be present at the execution" is misplaced.  That provision does not require the attendance of any citizens such as plaintiffs; to the contrary, it states that "*[n]ot more than*" a specified "number[]" of citizens (eight) or members of the press (ten)

11

"selected by the Warden" "shall be present." *Id.* § 26.4(c)(4) (emphasis added). The regulation's plain language thus imposes a *limit* on the attendance of those like plaintiffs, rather than bestowing any rights on them.

3. The district court did not dispute that the FDPA generally leaves execution dates to the government's discretion and confers no rights on execution witnesses. Instead, it viewed Arkansas law as providing execution witnesses with an enforceable right to attend Arkansas executions, and concluded that this state-law entitlement establishes an exception under the FDPA that required BOP to consider plaintiffs' availability under the APA.

As an initial matter, plaintiffs never argued that the FDPA gives them a statutory right to dictate the scheduling of Lee's execution by virtue of Arkansas law; indeed, they never referenced or cited Arkansas law *at all*. The district court "interjected" that argument, thereby "radical[ly] transform[ing]" the case. *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1582 (2020). That is reason enough for this Court to reject it. *See id.*

In any event, the district court's sua sponte theory misconstrues both federal and state law. The FDPA provides that an execution shall be "implement[ed] … in the manner prescribed by the law of the State in which the sentence is imposed." 18 U.S.C. § 3596(a). This provision, the district court concluded, incorporates Arkansas law provisions governing witnesses, *see* Ark. Code § 16-90-502, and more generally cuts off the federal government's scheduling discretion. *See* A7–8. The court relied

12

on the D.C. Circuit's decision in *In re Federal Bureau of Prisons' Execution Protocol Cases*, 955 F. 3d 106 (D.C. Cir. 2020), for its reading of the FDPA. *See* A7–8 & n.2.

But both the text of § 3596(a) and the D.C. Circuit's reasoning contradicts the district court's theory. Section 3596(a) incorporates only the "manner" of implementing the death sentence prescribed by state law. As Judge Katsas explained and three Justices of the Supreme Court strongly suggested, this provision captures only the "top-line choice among execution methods such as hanging, electrocution, or lethal injection." *See Execution Protocol Cases*, 955 F.3d at 113 (Katsas, J., concurring); *see also Barr v. Roane*, 140 S. Ct. 353 (2019) (mem.) (Statement of Alito, J.). And even on the more generous reading set forth in the controlling D.C. Circuit concurrence, Judge Rao identified only Ark. Code § 5-4-617, *not* Ark. Code § 16-90-502(c), as the relevant "manner" incorporated by the FDPA. *See, e.g.*, *Execution Protocol Cases*, 955 F.3d at 142 (Rao, J., concurring). And for good reason: Arkansas law itself describes Ark. Code § 5-4-617 as establishing the "manner" of execution. *See* Ark. Code § 16-90-502(c). Section 5-4-617 places no limits on the choice of an execution date, and even if it did, such a timing provision—like Section 16-90-502(c)'s provisions regarding witnesses—has nothing to do with the manner of implementing death sentences. Even the dissenting D.C. Circuit judge would not have extended the FDPA so far as the district court did here; in his view, the FDPA does not require the government to follow "every nuance" of a state procedure, but rather only "those procedures that effectuat[e] the death, including choice of lethal substances, dosages,

13

vein-access procedures, and medical-personnel requirements." *Execution Protocol Cases*, 955 F.3d at 151 (Tatel, J., dissenting) (quotation marks and citation omitted). Indeed, even the *plaintiffs* in that case, including Lee, disavowed the sweeping reading of the FDPA that the district court here adopted. *See* Case No. 19-5322 (D.C. Cir.), Oral Arg. at 1:01:04-40 (asserting that state law provisions regarding "who's in the chamber," and "those sorts of things" are "not part of the manner of implementing the sentence," which they cabined to the "manner of effectuating the death").

Finally, while the provisions of Arkansas law on which the district court relied are irrelevant to this case, the government notes that the district court misread them. Ark. Code. § 16-90-502(e)(1)(C) provides that "*no more than* six" specified family members of a victim "shall be present" "if he or she chooses to be present" (emphasis added). Like 28 C.F.R. § 26.4, this provision imposes a limit on, not an entitlement to, witness attendance. *See supra* p. 11-12. And the district court provided no support for its broader conclusion that Ark. Code. § 16-90-502(e)(1) gives *anyone* an enforceable right to attend an execution at their preferred time. Section 16-90-502 appears to prevent the prison from barring access to certain types of witnesses—but the district court cited no support for the proposition that it somehow requires Arkansas officials to plan an execution around witness schedules. It almost certainly does not, given that the provision also provides that "[c]ounsel for the person being executed if he or she chooses to be present" "shall be present," *id.* § 16-90-502(e)(1)(E), and Arkansas presumably has not granted a death-row inmate's lawyer

14

the right to unilaterally prevent his client's execution simply by refusing to attend or manufacturing scheduling conflicts. Accordingly, even if this statute were incorporated by the FDPA, it would provide no basis for the proposition that BOP was further required consider plaintiffs' schedules and travel preferences.

## B.    The Government's Selection Of Lee's Execution Date Was Not Arbitrary And Capricious.

In any event, the Attorney General's choice of an execution date was not arbitrary or capricious. Under courts' "narrow," *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), and "highly deferential" review of agency action under the arbitrary-and-capricious standard, *Sierra Club v. EPA*, 774 F.3d 383, 393 (7th Cir. 2014), plaintiffs cannot demonstrate that the Attorney General made a "clear error in judgment," *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 96 (1983), in rescheduling Lee's execution for July 13.

That choice was entirely consistent with the governing regulations, which provide that "[i]f the date designated for execution passes by reason of a stay of execution, a new date shall be designated promptly by the Director of the Federal Bureau of Prisons when the stay is lifted." 28 C.F.R. § 26.3(a)(1). BOP initially scheduled Lee's execution for December 2019. *See* DOJ Press Release No. 19-807, available at https://www.justice.gov/opa/pr/federal-government-resume-capital-punishment-after-nearly-two-decade-lapse. That execution date was preliminarily

15

enjoined, and although both the D.C. Circuit and the Supreme Court denied the

Government's emergency applications to stay or vacate the injunction, the Supreme

Court noted its "expect[ation] that the Court of Appeals [would] render its decision

with appropriate dispatch." *Roane*, 140 S. Ct. at 353. Throughout that litigation, the

government repeatedly emphasized its important interest in the timely enforcement of

death sentences. When the D.C. Circuit issued its mandate, the Government

promptly rescheduled the long-delayed execution, as contemplated by 28 C.F.R.

§ 26.3(a)(1). Rather than being arbitrary and capricious, that action reflects the

government's compliance with the governing regulation and its consistent position

that Lee's lawful sentence should be carried out promptly.

The district court incorrectly invalidated the agency's scheduling decision as

arbitrary and capricious on the grounds that BOP allegedly failed to consider (1)

plaintiffs' supposed rights under Arkansas law to attend the execution or to view it by

closed-circuit TV, and (2) any health risks related to conducting an execution during

the COVID-19 pandemic. *See* A11-12. As explained above, no provision of *federal*

law gives plaintiffs such rights, and even Arkansas law does not require *facilitating* such

attendance by considering witness's schedules and travel preferences. As noted

above, the contrary view would permit any attendee—including the defendant's

friends and family—to obstruct execution scheduling decisions. The discretion

afforded federal and state officials on this score makes sense; if they were obliged to

consider the schedule and travel preferences of every witness permitted to attend, they

16

could well be stymied in their effort to establish an execution date—especially since some witnesses, like plaintiffs here, may oppose the execution altogether.

Nor can BOP's failure to expressly mention the pandemic's possible effects on attendees in its scheduling notice provide a basis to set aside the execution. *See* A11. For one thing, BOP was under no obligation to document every rationale for its scheduling decision or every factor it considered before setting the execution date. *See Pension Ben. Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 653-56 (1990) (agency was not required to provide plaintiffs with a "statement showing its reasoning"). "Agency decisions are routinely informed by unstated considerations"; that is no basis to set them aside unless the articulated rationales are themselves inadequate or pretextual. *Department of Commerce v. New York*, 139 S. Ct. 2551, 2573 (2019); *see also Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania*, No. 19-431 at 24 (U.S. Jul. 8, 2020) (explaining that courts cannot add to the APA's procedural requirements). Here, the stated reasons were plainly sufficient: the scheduling notice explained that petitioners had received "full and fair proceedings" and that the executions were being scheduled in accordance with 28 C.F.R. § 26.3, the regulation that requires the "prompt[]" rescheduling of previously stayed executions. *See* https://www.justice.gov/opa /pr/executions-scheduled-four-federal-inmates-convicted-murdering-children. The laws and regulations did not require any more, *see supra*, p. 9-11.

Regardless, the district court's assumption that BOP did not consider the risks inherent in scheduling Lee's execution despite the emergence of COVID-19 is belied

17

by the record. Since March 2020, BOP has taken measures to minimize the spread of COVID-19. https://www.bop.gov/coronavirus/covid19_status.jsp. And BOP has consistently informed plaintiffs that it will have in place appropriate safety protocols and procedures to mitigate COVID-19 risks. *See* Winter Decl. at 2-4. In nevertheless finding BOP's scheduling decision arbitrary and capricious, the court improperly "substitute[d] its judgment for that of the agency." *State Farm*, 463 U.S. at 43.

Notably, BOP is not alone in resuming executions. Just three days ago, the Supreme Court cleared the way for Texas to resume executions after a five-month hiatus during the pandemic. *See Wardlow v. Davis*, No. 19-8850 (S. Ct.) (denying application for stay of execution and writ of certiorari). Those in attendance donned masks and gloves. *See* https://www.cbsnews.com/news/texas-executes-billy-joe-wardlow-for-killing-elderly-man-nearly-30-years-ago/. BOP likewise will employ a host of safety measures to reduce the risks of infection. *See* Winter Decl. at 2-4 (describing measures regarding social distancing, sanitization, and protective equipment). And to the extent the court viewed those measures as inadequate, they are the sort of "medical and scientific uncertainties" that must be addressed by "politically accountable officials" without inappropriate "second-guessing by an unelected federal judiciary." *South Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613–14 (2020) (Roberts, C.J., concurring in denial of application for injunctive relief) (quotation marks omitted).

18

## II.     The Balance Of Equities Strongly Favors Staying Or Vacating The Preliminary Injunction.

Because plaintiffs failed to establish a likelihood of success on the merits, "the court must deny the injunction." *GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 364 (7th Cir. 2019).  Only after a plaintiff satisfies this threshold does a court proceed to "weigh the harm that the plaintiff will suffer absent and injunction against the harm to the defendant from an injunction, and consider whether an injunction is in the public interest." *Id.*

Nevertheless, "wholly apart from the merits," the remaining stay factors also "strongly favor the government." *Execution Protocol Cases*, 955 F.3d at 126–27 (Katsas, J., concurring).  The mere "possibility" of viral exposure does not "demonstrate that irreparable injury is *likely* in the absence of an injunction," *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008), especially given the virus-related precautions BOP has taken and offered plaintiffs.  And plaintiffs' assertion of harm is diminished by their own delay until July 7 in seeking relief.  Any discussions regarding protective measures, *see* A13–14, provide no reason that plaintiffs could not have surfaced their extraordinary request that Lee's execution be halted "until treatment or a vaccine is available" sooner, Dkt. 1, at 29.

Moreover, whatever harms flow from plaintiffs' individual decisions regarding attendance, they do not outweigh the government's interest in carrying out scheduled executions after lengthy post-conviction review periods.  *Cf. Execution Protocol Cases*,

19

955 F.3d at 129 (Katsas, J., concurring) (noting that federal courts "should not assist" attempts "to delay lawful executions indefinitely"). Indeed, just yesterday, this Court rejected Lee's attempt to stop his execution, calling this latest attempt to obtain post-conviction relief "frivolous." *Lee v. Watson*, No. 20-2128, slip op. 6 (7th Cir. July 10, 2020). And the court of conviction, in rejecting Lee's recent request to reschedule his July 13 execution in light of COVID-19, reasoned in part that "no more delay is warranted" and that the "Government's interest in finality … counsel[s] in favor of the July 13 date." *United States v. Lee*, No. 4:97-cr-00243 (E.D. Ark. July 10, 2020), Dkt. 1425, at 9. In so ruling, the court refused to substitute its own "weighing of the advantages and disadvantages" for the "judgment" of the "elected branches of government" which have not suspended executions during this time. *Id.* at 10.

Indeed, even where an inmate himself directly challenges the method of execution, the Supreme Court has warned that courts must "police carefully against attempts to use such challenges as tools to interpose unjustified delay," *Bucklew v. Precythe*, 139 S. Ct. 1112, 1134 (2019), which can even "undermine [capital punishment's] jurisprudential rationale by reducing its deterrent effect and retributive value," *id.* at 1144 (Breyer, J., dissenting) (alternation in original) (quotation marks omitted). Moreover, once post-conviction proceedings "have run their course," as they have here, "an assurance of real finality" is necessary for the government to "execute its moral judgment." *Calderon v. Thompson*, 523 U.S. 538, 556 (1998). The interest in doing so does not belong exclusively to victims or their families, let alone a

subset of them.  The government takes the views of surviving family members—including plaintiffs—on the propriety of a death sentence seriously, in accordance with their terrible loss and distinctive perspective.   But "[b]oth the [government] and [all] the victims of crime have an important interest in the timely enforcement of a sentence."  *Hill v. McDonough*, 547 U.S. 573, 584 (2006).  Thus, plaintiffs' opposition to Lee's execution, *see* NY Times, *She Doesn't Want Her Daughter's Killer To Be Put To Death. Should the Government Listen?*, https://www.nytimes.com/2019/10/29/us/arkansas-federal-death-penalty.html?smid=em-share, does not undermine the public's strong interest in redressing Lee's crimes and deterring others from committing similarly horrific acts.

Finally, the government's interest in implementing Lee's sentence is "magnified by the heinous nature" of those crimes, which include murdering a child in a brutal fashion.  *See Execution Protocol Cases*, 955 F.3d at 127 (Katsas, J., concurring) (discussing Lee's crimes).  Plaintiffs' interest in witnessing the execution that will redress Lee's terrible crimes cannot outweigh the government's interest in actually conducting it.

21

# CONCLUSION

This Court should stay or vacate the district court's order barring the

government from proceeding with Lee's scheduled execution.

Respectfully submitted,

DAVID M. MORRELL*
  *Deputy Assistant Attorney General*

JOSH J. MINKLER
  *United States Attorney*

SOPAN JOSHI
  *Senior Counsel to the Assistant*
  *Attorney General*

PAUL R. PERKINS
  *Special Counsel*

MELISSA N. PATTERSON
AMANDA L. MUNDELL
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7236*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-3469*
  *amanda.l.mundell@usdoj.gov*

*The Acting Assistant Attorney General is recused in this case.

July 2020

## CERTIFICATE OF COMPLIANCE

I hereby certify that this motion satisfies the type-volume limitation in Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5176 words.  This motion also complies with the typeface and type-style requirements of Rule 32(a)(5) and Rule 32(a)(6) because it was prepared using Microsoft Word 2016 in Garamond 14-point font, a proportionally spaced typeface.

/s/ Amanda L. Mundell
AMANDA L. MUNDELL

## CERTIFICATE OF SERVICE

I hereby certify that on July 11, 2020, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the appellate CM/ECF system. Parties to the case are represented by a registered CM/ECF user, and service will be accomplished by the appellate CM/ECF system.  The foregoing was also sent by email to Howard B. Kurrus at bkurrus@aol.com.

*/s/  Amanda L. Mundell*
AMANDA L. MUNDELL

**ADDENDUM**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| EARLENE PETERSON, | ) | |
| KIMMA GUREL, | ) | |
| MONICA VEILLETTE, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 2:20-cv-00350-JMS-DLP |
| | ) | |
| WILLIAM P. BARR, | ) | |
| MICHAEL CARVAJAL, | ) | |
| T.J. WATSON, | ) | |
| | ) | |
| Defendants. | ) | |

**Order Granting Plaintiffs' Motion for Preliminary Injunction**

Federal death row inmate Daniel Lee Lewis is scheduled to be executed on July 13, 2020, at United States Penitentiary − Terre Haute (USP − Terre Haute) in Terre Haute, Indiana.

Plaintiffs Earlene Peterson, Kimma Gurel, and Monica Veillette are members of Mr. Lee's victims' families and have been selected by the Warden of USP-Terre Haute to attend the execution. The plaintiffs seek to enjoin Mr. Lee's execution on the basis that defendants have violated the Administrative Procedure Act (APA) by scheduling Mr. Lee's execution during the COVID-19 pandemic without adequate measures in place to protect them. The defendants oppose the motion on the bases that the decision of when to set an execution is an unreviewable agency action, the plaintiffs are outside the zone of interests, and the government's decision to promptly schedule the executions was not arbitrary and capricious.

1

**A1**

## I.      Factual and Procedural Background

### A.      Mr. Lee's Crimes, Sentence, and Procedural History

In 1999, a jury in the United States District Court for the Eastern District of Arkansas convicted Mr. Lee of conspiring to violate and violating the Racketeer Influenced and Corrupt Organizations (RICO) statute, 18 U.S.C. § § 1962(c) and (d), and of three murders. *United States v. Lee*, 374 F.3d 637, 641 (7th Cir. 2004). Mr. Lee's murder victims were William Mueller, Nancy Mueller, and Nancy Mueller's eight-year-old daughter, Sarah Powell. *Id.* at 641–42. Mr. Lee was sentenced to death. *Id.* at 643.

Mr. Lee's conviction was affirmed on appeal, *id.* at 641, and his petition for certiori was denied, 545 U.S. 1141 (2005). He has unsuccessfully sought post-conviction relief pursuant to 28 U.S.C. § 2555 and has exhausted all appeals as to his § 2255 proceedings. *See United States v. Lee*, No. 4:97-CR-00243-(2), 2008 WL 4079315, at *1 (E.D. Ark. Aug. 28, 2008), *aff'd*, 715 F.3d 215 (8th Cir. 2013), *rehearing denied*, 811 F.3d 272  (8th Cir. 2015), *cert. denied*, 135 S. Ct. 72 (2014); *United States v. Lee*, No. 4:97-cr-00243-02, 2014 WL 1093197, at *1 (E.D. Ark. Mar. 18,  2014), *aff'd*, 792 F.3d 1021 (8th Cir. 2015), *rehearing denied*, 811 F.3d 272 (8th Cir. 2015), *cert denied*, 137 S. Ct. 1577 (2017).

On July 25, 2019, the Attorney General announced that capital executions would resume after nearly two decades without any executions in the federal system. *See* The United States Department of Justice, "Federal Government to Resume Capital Punishment After Nearly Two Decade Lapse," July 25, 2019, https://www.justice.gov/opa/pr/federal-government-resume-capital-punishment-after-nearly-two-decade-lapse. The Bureau of Prisons (BOP) adopted a revised addendum to its lethal injection protocol that replaced the previous three-drug procedure with the use of a single drug, pentobarbital sodium, as the lethal agent. *Id.* In announcing the change to the injection protocol, DOJ also established execution dates for five condemned federal inmates, including Mr. Lee. *Id.* Mr. Lee's execution was scheduled for December 9, 2019.

A2

Mr. Lee filed suit challenging BOP's single-drug protocol and on November 20, 2019, the district court issued a preliminary injunction staying the executions. *In re Federal Bureau of Prisons' Execution Protocol Cases*, 955 F. 3d 106, 111 (D.C. Cir. 2020) ("*Execution Protocol Cases*"). That injunction was vacated by the D.C. Circuit on April 7, 2020. *Id.* at 108. On June 29, 2020, the Supreme Court denied an application for a stay of the mandate. *Bourgeois v. Barr*, 19-1348, --- S. Ct. ---, 2020 WL 3492763.

### B.      The Novel Coronavirus and Mr. Lee's Scheduled Execution

The novel coronavirus ("COVID-19") has been spreading in the United States since early 2020. As of July 9, 2020, there were 3,047,671 reported cases in the United States, including 368,441 cases in the past week. Centers for Disease Control and Prevention, Covid Data Tracker, https://www.cdc.gov/covid-data-tracker/#cases (last visited July 10, 2020). 132,056 people have died from the virus in the United States. *Id.* In Indiana, there have been 49,063 confirmed cases and 2,732 resulting deaths. Indiana COVID-19 Dashboard, https://www.coronavirus.in.gov/2393.htm (last visited July 10, 2020). Due to COVID-19, the Bureau of Prisons has limited inmate movement and suspended social and legal visits. *See* "BOP Implementing Modified Operations," https://www.bop.gov/coronavirus/covid19_status.jsp (last accessed July 10, 2020).

Nevertheless, on June 15, 2020, with the COVID-19 pandemic well underway, the Department of Justice announced four execution dates, including Mr. Lee's on July 13, 2020. *See* Press Release, Dep't of Justice, "Executions Scheduled for Four Federal Inmates Convicted of Murdering Children" (June 15, 2020), https://www.justice.gov/opa/pr/executions-scheduledfour-federal-inmates-convicted-murdering-children.

**A3**

## C.      The Plaintiffs

The plaintiffs in this action are relatives of the victims:

Plaintiff Earlene Branch Peterson is Nancy Mueller's mother and Sarah Powell's grandmother.[1] Dkt. 1 at ¶ 5. She is 81 years old and lives in Hector, Arkansas, more than 500 miles from Terre Haute. *Id.* at ¶ 13. She suffers from congestive heart failure and has other underlying health conditions that put her at increased risk for developing COVID-19-related complications. Dkt. 17-1, ¶ 4. Pursuant to her doctor's directions, she has remained at home since March 10, 2020, receiving deliveries for groceries and medicine. *Id.* at ¶¶ 4, 6.

Plaintiff Kimma Gurel is Nancy Mueller's sister and Sarah Powell's aunt. *Id.* at ¶ 6. She is 61 years old and lives in Spokane Valley, Washington, nearly 2,000 miles from Terre Haute. *Id.* at ¶ 14. She also has underlying health conditions that put her at an increased risk for COVID-19-related complications. *Id.*

Plaintiff Monica Veillete is Nancy Mueller's niece and Sarah Powell's cousin. *Id.* at ¶ 7. She is 43 years old and lives in Deer Park, Washington, nearly 2,000 miles from Terre Haute. *Id.* at ¶ 15.

28 C.F.R. § 26.4 provides that up to eight "citizens" "selected by the Warden" shall be present at the execution. The BOP Execution Protocol states that the Warden will select up to eight citizens and that "in identifying these individuals, the Warden, no later than 30 days after the setting of an execution date, will ask the United States Attorney for the jurisdiction in which the inmate was prosecuted to recommend up to eight individuals who are victims or victim family

---

[1] The defendants refer to the plaintiffs merely as "extended family members of Mr. Lee's victims." Dkt. 10 at 3. This insensitivity reflects the defendants' pervasive indifference for the plaintiffs' legal and personal interests in Mr. Lee's scheduled execution.

members to be witnesses of the execution." Dkt. 9 at 10. All three plaintiffs were selected by the Warden to witness Mr. Lee's execution.

On July 2, 2020, Dale Hartkemeyer (aka Seigen) filed a complaint in this Court. *Hartkemeyer v. Barr, et al.*, No. 2:20-cv-00036-JMS-DLP. Mr. Hartkemeyer is the spiritual advisor to inmate Wesley Purkey, whose execution is scheduled for July 15, 2020. Mr. Hartkemeyer alleged that the government's plan to execute Mr. Purkey violated his rights under the Religious Freedom Restoration Act (RFRA) and the APA in light of the risks posed by COVID-19. *Id.* at 1. On July 7, 2020, the plaintiffs moved to intervene in Mr. Hartkemeyer's case. Dkt. 35. The Court denied their request, finding that although both cases accuse the defendants of violations of the APA, the facts underlying the claims were different. Dkt. 54 at 4. The Court directed the clerk to open a new action based on the plaintiffs' proposed complaint. *Id.* at 4–5.

The plaintiffs argue that the government violated the APA by scheduling Mr. Lee's execution during the ongoing COVID-19 pandemic, making it dangerous for them to attend.

## II.    Preliminary Injunction Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The plaintiff must satisfy a four-prong test, establishing "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.*

"'A party moving for preliminary injunctive relief need not demonstrate a likelihood of absolute success on the merits. Instead, he must only show that his chances to succeed on his claims are better than negligible.'" *Valencia v. City of Springfield*, 883 F.3d 959, 966 (7th Cir. 2018) (quoting *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1046

A5

(7th Cir. 2017). But if it is clear that the party cannot show a likelihood of success on the merits, the Court should refuse the injunction regardless of the balance of harms. *Id.* at 966.

Finally, "before granting a stay, a district court must consider not only the likelihood of success on the merits and the relative harms to the parties, but also the extent to which the [movant] has delayed unnecessarily in bringing the claim." *Nelson v. Campbell*, 541 U.S. 637, 649−50 (2004).

### III.    Discussion

#### A.    Likelihood of Success on the Merits

The defendants argue that the plaintiffs are unlikely to succeed on the merits for three reasons: 1) judicial review is unavailable under the APA; 2) the plaintiffs do not fall within the "zone of interests" of any relevant law to challenge an execution date; and 3) the Attorney General's decision was not arbitrary or capricious, nor was it "not in accordance with law." The Court addresses each argument in turn.

##### 1.    The Plaintiffs Have a Strong Likelihood of Showing Their Claim Is Reviewable under the APA.

"The APA 'sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts.'" *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1905 (2020) (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992)). "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702.

"The APA establishes a 'basic presumption of judicial review [for] one suffering legal wrong because of agency action.'" *Regents of the Univ. of California*, 140 S. Ct. at 1905 (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 140 (1967)). The agency may rebut that presumption by

establishing that its action falls into one of two exceptions set out in 5 U.S.C. § 701. *See id.*

First, the APA does not permit judicial review where "statutes preclude judicial review" of the

agency action. 5 U.S.C. § 701(a)(1). Second, the APA does not permit judicial review where the

action "is committed to agency discretion by law." 5 U.S.C. § 701(a)(2).

The defendants argue that their decision to schedule an execution is committed to agency

discretion by law. But courts are directed to read § 701(a)(2)'s exception "quite narrowly,

restricting it to those rare circumstances where the relevant statute is drawn so that a court would

have no meaningful standard against which to judge the agency's exercise of discretion." *Dep't of

Commerce v. New York*, 139 S. Ct. 2551, 2568 (2019) (internal quotation omitted). And contrary

to the defendants' suggestion, agency decisions regarding implementation of the death penalty are

not categorically off limits. *See generally Execution Protocol Cases*, 955 F. 3d 106 (reviewing

claims regarding agency's execution protocol under the APA). Indeed, in the *Execution Protocol

Cases*, neither the Supreme Court nor any of the opinions in the D.C. Circuit Court of Appeals

embraced the defendants' argument here that such claims are unreviewable. *Id.*; *see Bourgeois v.

Barr*, --- S. Ct. ----, 2020 WL 3492763 (Mem.) (denying certiorari).

Here, the Federal Death Penalty Act of 1994 (FDPA) provides the relevant standards. The

FDPA provides that a person sentenced to death "shall be committed to the custody of the Attorney

General until exhaustion of the procedures for appeal of the judgment of conviction and for review

of the sentence." 18 U.S.C. § 3596(a). "When the sentence is to be implemented, the Attorney

General shall release the person sentenced to death to the custody of a United States marshal, who

shall supervise implementation of the sentence in the manner prescribed by the law of the State in

which the sentence is imposed." *Id.*

**A7**

The "law of the State in which the sentence is imposed" includes state statutes and binding regulations that govern the execution process. *Execution Protocol Cases*, 955 F.3d at 134 (Rao, J., concurring) ("federal government [must] follow all procedures prescribed by state statutes and formal regulations, but no more.").[2] As relevant here, Arkansas law provides a fairly robust statutory scheme governing the conduct of executions. *See* Ark. Code §§ 4-5-617, 16-90-502.

Thus, the FDPA does not commit the choice of scheduling an execution to agency discretion. The agency's discretion is bound by the language of the FDPA and by "the law of the State in which the sentence is imposed." 18 U.S.C. § 3596(a).

### 2. The plaintiffs Have a Strong Likelihood of Showing They State a Claim Within the FDPA's Zone of Interests.

The Court may review the plaintiffs' APA claim only if they are "aggrieved by agency action . . . within the meaning of a relevant statute." 5 U.S.C. § 702. To satisfy this requirement, the plaintiffs' claim must at least be "arguably within the zone of interests" that Congress sought to protect or regulate under the statute in question. *Ass'n of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150, 153 (1970).

The defendants assert that the FDPA "makes no provision for witnesses such as Plaintiffs to attend an execution, much less provides them a private cause of action to protect *their* rights." Dkt. 10 at 13−14 (emphasis in original). True, the FDPA itself does not explicitly mention victims, but it does provide that an execution must proceed "in the manner prescribed by the law of the State in which the sentence is imposed." 18 U.S.C. § 3596(a); *See Execution Protocol Cases*, 955 F.3d at 134 (Rao, J., concurring). And Arkansas law provides significant rights to victims' family members in the context of an execution.

---

[2] The D.C. Circuit's decision in *Execution Protocol Cases* does not bind this Court, but the Court recognizes Judge Rao's concurrence, which provides the narrower basis for the result, as the controlling opinion. *Cf. Marks v. United States*, 430 U.S. 188, 193 (1976).

**A8**

Under Arkansas law, a spouse, parent, adult sibling, or adult child of the victim "shall be present" for the execution "if he or she chooses to be present." Ark. Code § 16-90-502(e)(1)(C). Two of the three plaintiffs here qualify, as Ms. Peterson is Nancy Mueller's mother, and Ms. Gurel is Nancy Mueller's adult sibling. The same statute provides that "[t]he director may prohibit a person who otherwise would be eligible to witness or view an execution under this subsection if he or she determines the person to be a security risk." Ark. Code § 16-90-502(e)(2). This suggests that eligible persons cannot be prohibited for any reason whatsoever. Unless they are a security risk, Arkansas law provides them a right to be present for the execution.

Even if not a spouse, child, sibling, or parent, "[a]ny other adult relative with a close relationship to the victim" also has rights under the statute. Ark. Code § 16-90-502(e)(2)(D) (defining "Close relative of the victim"). Specifically, "[a] closed-circuit audiovisual monitor dedicated to viewing a live broadcast of the execution shall be placed in a location chosen by the director for the benefit of any close relative of the victim . . . who desires to view the execution and who is not witnessing the execution as allowed under subdivision (e)(1)(C)." Ark. Code § 16-90-502(e)(5)(A). Ms. Veillette satisfies the definition of a "[c]lose relative of the victim."

The FDPA directs federal authorities to follow state law in implementing an execution, and state law provides rights to victims' family members. The plaintiffs therefore have a strong likelihood of showing that their claim is "arguably within the zone of interests" Congress intended to protect with the FDPA.

> **3.    The plaintiffs Have a Strong Likelihood of Showing that the Defendants' Setting Execution Dates During a Pandemic Without Adequately Considering Whether the Victims' Family Could Safely Attend Was Arbitrary and Capricious or Not in Accordance With Law.**

The APA "instructs reviewing courts to set aside agency action that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Dep't of Commerce*, 139 S. Ct.

at 2567 (quoting 5 U.S.C. § 706(2)(A)). The reviewing court must limit its inquiry to whether the agency "examined 'the relevant data' and articulated 'a satisfactory explanation' for its decision, 'including a rational connection between the facts found and the choice made.'" *Id.* at 2569 (quoting *Motor Vehicle Mfrs. Assn. of United States v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983)). "Under this highly deferential standard, an administrative decision should be upheld if the agency's path may be reasonably discerned." *Sierra Club v. U.S. EPA*, 774 F.3d 383, 393 (7th Cir. 2014) (internal quotation omitted).

"But even deferential review should 'be searching and careful' when considering 'whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Boucher v. United States Dep't of Agric.*, 934 F.3d 530, 547 (7th Cir. 2019) (quoting *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 378 (1989)). "An agency decision will be found 'arbitrary and capricious' if it 'relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *State Farm*, 463 U.S. at 43). "If a reviewing court is faced with 'such deficiencies,' it 'should not attempt itself to make up' for those gaps by 'supply[ing] a reasoned basis for the agency's action that the agency itself has not given.'" *Id.* (quoting *State Farm*, 463 U.S. at 43).

Even applying the deferential standard, the plaintiffs have a strong likelihood of showing that the defendants' actions were arbitrary and capricious or not in accordance with law. The defendants assert that the plaintiffs have no right to be present for the execution. Dkt. 10 at 4 ("The fact that Plaintiffs are victims of Lee's crime means that the government has made efforts to accommodate their attendance, but in terms of legally enforceable rights vis-à-vis Lee's capital

10

sentence, they stand in the shoes of any member of the public."). This assertion alone underscores that the defendants "entirely failed to consider an important aspect of the problem," *see Boucher*, 934 F.3d at 547 (internal quotation omitted)—namely, victims' family members' rights to be present for the execution under Arkansas law.

The agency record, such as it is, offers no help to the defendants. They have produced no evidence to show that their decision to conduct an execution during a pandemic accounted for the victims' family's right to be present. To be sure, they have produced evidence that the family members—like any other member of the public who attends the execution—will have access to personal protective equipment, soap, and hand sanitizer while on prison grounds. *See Hartkemeyer v. Barr, et al.*, No. 2:20-cv-336-JMS-DLP, dkt. 51-1, ¶ 11 (Declaration of Rick Winter (July 8, 2020)). But there is no evidence that the defendants considered whether these measures give adequate protection to the plaintiffs, who have a right to be present under Arkansas law (and thus the FDPA). The defendants also gave no consideration to whether Ms. Peterson, who must travel more than 500 miles from Arkansas, and Ms. Gurel, who will travel by plane from Washington, can safely get to Terre Haute for the execution. *See* dkt. 10 at 8 (conceding that the government has no control over the safety of the plaintiffs' travel). And they apparently gave no consideration to the requirement that closed-circuit viewing be made available for close relatives of the victim. Ark. Code § 16-90-502(e)(5)(A). Indeed, given the defendants' argument that the plaintiffs are "outside the zone of interests" it appears they gave no consideration to their rights whatsoever.

Accordingly, the plaintiffs have shown a strong likelihood of prevailing on their claim that the defendants' setting of Mr. Lee's execution date without considering their right to be present was arbitrary and capricious and not in accord with law.

11

**A11**

## B.     Irreparable Harm

The defendants argue that the only potential harm to the plaintiffs is "the mere 'possibility' that the plaintiffs will be exposed to COVID-19 if they attend the execution." Dkt. 10 at 19. Not so. The harm to Ms. Peterson, for example, is being forced to choose whether being present for the execution of a man responsible for the death of her daughter and granddaughter is worth defying her doctor's orders and risking her own life.

If there were any doubt about the seriousness of this harm, Ms. Peterson's declaration puts it to rest:

> I am now faced with an impossible choice of either not exercising my right to attend the execution, or traveling in dangerous conditions which could cause me to become very sick, or even die.

> I want to attend this execution at a time when it is safe for people to travel. Although I have some medical issues, I can travel if the conditions are not especially dangerous.

> I pray every day for my lost daughter and granddaughter. As a mother I feel very sorry for Daniel Lewis Lee's mother. I hope somehow by attending I can find some peace. Right now I am not at peace.

Dkt. 17-1 at 4.

The plaintiffs have shown irreparable harm absent the grant of a preliminary injunction.

## C.     Balance of Harms

The government has an interest in the prompt and orderly execution of Mr. Lee's death sentence. *See Bucklew v. Precythe*, 139 S. Ct. 1112, 1133 (2019) (the government has "an important interest in the timely enforcement of a sentence" (internal quotation omitted)); *Calderon v. Thompson*, 523 U.S. 538, 556 (1998) (after years of litigation, the government "is entitled to the assurance of finality"). But the government's interest is intertwined with—and based in part upon— the victim's interest in timely justice. *See Bucklew*, 139 S. Ct. at 1133 (ascribing "important interest" in finality to "[b]oth the [government] and the victims of crime"); *Calderon*, 523 U.S. at 556 ("Only

A12

with real finality can the victims of crime move forward knowing the moral judgment will be carried out.").

At least three family members of Lee's victims—Ms. Peterson, Ms. Gurel, and Ms. Veillette—have expressed a greater interest in safely attending the execution than in having the execution proceed on the government's timetable. The defendants suggest that other family members may have different priorities. Dkt. 10 at 19 ("[Ms. Peterson] is not the lone family member of a victim of Mr. Lee's crimes."). But the defendants present no evidence to support that suggestion. The balance of harms weighs in the plaintiffs' favor.

### D.      Public Interest

The public, like the government, has an interest in prompt and orderly execution of Mr. Lee's death sentence. But the public also has an interest—codified by Congress—in ensuring that crime victims are "treated with fairness and with respect for the victim's dignity." 18 U.S.C. § 3771(a)(8). In this case, the public's interest in a prompt, orderly execution should give way to their interest in treating Ms. Peterson, Ms. Gurel, and Ms. Veillette with fairness, respect, and dignity.

### E.      Unnecessary Delay

The defendants do not argue that a stay should be denied based on the plaintiffs' unnecessary delay in bringing the claim. Any such argument is therefore waived.

In any event, the plaintiffs did not unnecessarily delay in bringing their claim. While they did not file a complaint immediately after Mr. Lee's execution date was announced, they did try to obtain assurances about safety measures from Bureau of Prisons staff member Steve Markle. Dkt. 17-2 at ¶¶ 6, 8 (Monica Veillette Affidavit).  Ms. Veillette spoke with Mr. Markle several times, and he informed her that "it would be impossible to maintain social distancing at the witness

13

**A13**

room, in the hallways, in the transport vans, at checkpoints and at other areas in the prison." *Id.* at

¶ 8. When Ms. Veillette asked for a written description of the safety measures the Bureau of Prisons

had in place, he responded that he could not provide anything in writing "because it would be

'discoverable.'" *Id.* at ¶ 10.

The plaintiffs will not be penalized for seeking an informal remedy before filing this lawsuit.

### IV. Conclusion

The plaintiffs' motion for preliminary injunction, dkt. [2], is **granted** to the extent that

the Court enjoins the defendants from carrying out the execution of Daniel Lewis Lee on July 13,

2020, or on any future date, pending final resolution of the merits of this case or until further order

of this Court. The Court will vacate the injunction upon a showing by the defendants of an

agency action setting a date for Mr. Lee's execution in accord with the FDPA and

demonstrating reasonable consideration of the plaintiffs' right to be present for the execution.

The **clerk is directed** to correct the name of plaintiff Monica Veillette on the docket.

**IT IS SO ORDERED.**

Date: 7/10/2020

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

Distribution:

Howard Baker Kurrus
H. Baker Kurrus, PLLC
bkurrus@aol.com

Shelese M. Woods
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
shelese.woods@usdoj.gov

14

**A14**