IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

| | |
|---|---|
| EARLENE PETERSON, KIMMA GUREL, and MONICA VEILLETTE; <br><br> *Plaintiffs-Appellees*, <br><br> v. <br><br> WILLIAM P. BARR, in his official capacity as the Attorney General of the United States; MICHAEL CARVAJAL, in his official capacity as Director of the Federal Bureau of Prisons; and T.J. WATSON, in his official capacity as Complex Warden for Terre Haute Federal Correction Complex, <br><br> *Defendants-Appellants*. | Case No. 20-2552 |

## OPPOSITION TO DEFENDANTS-APPELLANTS EMERGENCY MOTION FOR STAY PENDING APPEAL

Matthew M. Collette
Kathryn A. Robinette
MASSEY & GAIL LLP
1000 Maine Ave SW, Suite 450
Washington, D.C. 20005
202) 652-4511

H. Baker Kurrus
H. Baker Kurrus, PLLC
10816 Crestdale Lane
Little Rock, AR 72212
(501) 831-0325

## INTRODUCTION

In the midst of a global pandemic that has claimed the lives of 135,000 people in the United States and that continues to ravage large swaths of the Nation, the Attorney General and the Bureau of Prisons decided to hold the first federal executions of prisoners since 2003. Heedless of the risks to vulnerable individuals scheduled to attend the execution due to their status as the families of crime victims—risks that have led the Federal Correctional Facility at Terre Haute, Indiana to close its doors to *all* visitors—the government insists that the long-delayed execution must happen *immediately*.

Ironically, one of the primary reasons the government asserts that it must execute Lee on Monday is to serve "crime victims and their families."[1]  But despite repeatedly invoking the interest of victims and their families, the government not only disregards the risks to those families in attending the execution, but cynically asserts that they have no interest in the issue worth pursuing in the courts.

---

[1] *See, e.g., Executions scheduled for four federal inmates convicted of murdering children*, The United States Department of Justice Office of Public Affairs, June 15, 2020 ("We owe it to the victims … and to the families left behind to carry forward the sentence imposed in our justice system.") (https://www.justice.gov/opa/pr/executions-scheduled-four-federal-inmates-convicted-murdering-children) (last visited July 9, 2020).

Each of the plaintiffs (consistent with federal and state law and regulations, as well as the requirements of Bureau of Prisons protocols) is scheduled to witness the execution.  As family members of the victims, the plaintiffs have an intense and personal interest in this matter.  However, plaintiffs face substantial risks from the unprecedented COVID-19 pandemic if they travel and attend the execution as matters now stand.  Indeed, the Centers for Disease Control has strongly advised against travel and large in-person gatherings.  *See* US, CDC https://www.cdc.gov/coronavirus/2019-ncov/travelers/travel-in-the-us.html (last visited June 28, 2020).

The government obscures the issue by filling its brief with a recitation of the heinous crimes of which Daniel Lewis Lee was convicted.  Plaintiffs Earlene Peterson, Kimma Gurel and Monica Veillette need no reminder of the gruesome details of those crimes. They are the mother, grandmother, mother-in-law, sister, niece, and cousin of the three persons who were murdered.  Earlene Peterson knows how her daughter and granddaughter died, and she prays for grace to ease the pain.  Earlene Peterson attended the ten-week trial of Danny Lee regularly.  Earlene, Kimma and Monica have lived with

3

their losses and grief for over twenty years. They do not seek to "set the execution date," or to overturn the results of years of litigation in which they were not involved as litigants. They seek to exercise their lawful rights to attend the execution of Lee, so that they can be together at that moment in time as they grieve their losses.

The government attempts to dismiss plaintiffs' health risks as "travel preferences" and to portray their concerns as "unwillingness to travel." But Mr. Peterson, at 81 years old, is in poor health and has been advised by her doctor not to travel until the pandemic abates enough to permit safe travel and attendance. The government's insistence that the execution happen within a few days means that she must either forego attendance at the execution or expose herself to substantial risk in traveling and attending.

The district court correctly granted an injunction to preclude the government from carrying out the execution until plaintiffs' safety can be guaranteed, and the government will not suffer irreparable injury from this decision. The government's motion should be denied.

## STATEMENT OF FACTS

### A.    Current Conditions due to Pandemic

COVID-19 is a highly contagious and deadly respiratory disease that has claimed the lives of more than 552,000 worldwide.[2] Public health officials believe it is spread mainly from person-to-person, including by people who do not exhibit any symptoms.[3] While the risk of exposure to everyone is great, older adults and individuals with certain underlying medical conditions are at increased risk of severe illness and death.[4] There is currently no vaccine or effective treatment for the virus and public health experts agree that the best preventive measure is to avoid contact with others.

In recent weeks, the U.S. has reported record-breaking increases in new cases,[5] leading many analysts to conclude we are in the grips of

---

[2] *Live updates: Experts call for shutdowns as coronavirus infections and hospitalizations spike in some states* (July 10, 2020), https://www.washingtonpost.com/nation/2020/07/10/coronavirus-live-updates-us/.

[3] *How to Protect Yourself & Others*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (last visited July 10, 2020).

[4] *People Who Are at Increased Risk for Severe Illness*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-increased-risk.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fpeople-at-higher-risk.html (last visited July 10, 2020).

[5] *New Coronavirus Cases in U.S. Soar Past 68,000 Shattering Record*, (July 10, 2020) https://www.nytimes.com/2020/07/10/world/coronavirus-updates.html.

a second, and devastating, surge.[6]  An all-time high of 68,241 new cases were reported on July 10 and the number is rising daily.[7]  Eastern Washington, where two of the Plaintiffs live, is confronted with "exploding case loads."[8]  In just the last week, Spokane County experienced a "dramatic uptick," with cases rising by roughly 34 percent.[9]

The CDC has advised that "staying home is the best way to protect yourself and others" and has specifically recommended *against* domestic travel, given the increased chances of both getting infected and spreading the disease.[10]  Several states have enacted orders requiring production of a negative COVID-19 test or quarantine for

---

[6] Robinson Meyer and Alexis Madrigal, *A Devastating New Stage of the Pandemic* (June 25, 2020), https://www.theatlantic.com/science/archive/2020/06/second-coronavirus-surge-here/613522/; Aimee Picchi, *Coronavirus surge: Next bailout could cost $1.5 trillion, Moody's says* (July 10, 2020). https://www.cbsnews.com/news/coronavirus-economic-relief-1-5-trillion-needed-moodys/.

[7] *See n.5, supra.*

[8] Lauren Kirschman, *Coronavirus updates: State reaches 35,898 cases with surge in Eastern Washington* (July 5, 2020) https://www.thenewstribune.com/news/coronavirus/article244013177.html (last visited July 1, 2020)

[9] Samantha Wohlfeil, *As coronavirus cases spike, Spokane health officer warns first wave could last into another flu season* (July 9, 2020), https://www.inlander.com/spokane/as-coronavirus-cases-spike-spokane-health-officer-warns-first-wave-could-last-into-another-flu-season/Content?oid=19897892.

[10] Considerations for Travelers-Coronavirus in the US, CDC https://www.cdc.gov/coronavirus/2019-ncov/travelers/travel-in-the-us.html (last visited June 28, 2020).

domestic travelers upon arrival.[11]  Dr. Anthony Fauci, the director of the National Institute of Allergy and Infectious Diseases, has specifically recommended that elderly persons and those with underlying conditions avoid "large crowds" and "long trips."[12]

Lee's execution is scheduled to take place at USP Terre Haute, which reported its first case of COVID-19 on May 16, 2020.[13]  Although BOP data regarding COVID-19 is limited and incomplete, at least ten inmates have tested positive at Terre Haute, and at least one prisoner has died.[14]  Outbreaks at other prison facilities have been devastating; an outbreak at a Tennessee prison sickened 583 inmates and led to at least 38 prison staff members contracting the virus.[15]

---

[11] https://www.travelandleisure.com/travel-news/what-to-know-about-each-state-during-the-coronavirus.

[12] Ben Kamisar, *Fauci: Those 'vulnerable' to coronavirus should limit travel and crowd exposure* (March 8, 2020), https://www.nbcnews.com/politics/meet-the-press/fauci-those-vulnerable-coronavirus-should-limit-travel-crowd-exposure-n1152501.

[13] Lisa Trigg, *Case of COVID-19 Infection Reported at Federal Prison in Terre Haute*, Tribute-Star (May 18, 2020), https://www.tribstar.com/news/case-of-covid-19-infection-reported-at-federal-prison-in-terre-haute/article_85a075ee-9940-11ea-87fe-fb3a2398734d.html.

[14] https://www.bop.gov/coronavirus/ (last visited July 10, 2020); *Terre Haute Prison Inmate With COVID-19 Dies; 3 More Have It*, U.S. News (May 26, 2020), https://www.usnews.com/news/best-states/indiana/articles/2020-05-26/3-terre-haute-federal-prison-inmates-positive-for-covid-19.

[15] Bill Hutchinson, *COVID-19 outbreak infecting over 500 prisoners may have come from staff: Medical director* (April 28, 2020), https://abcnews.go.com/US/covid-19-outbreak-infecting-500-prisoners-staff-medical/story?id=70382322.

As a result of the pandemic, BOP has implemented widespread modified operations to mitigate spread, including severely curtailing inmate movement, and suspending tours, staff travel, and training.[16] In addition, *all* visitations to USP Terre Haute have been suspended.[17] Despite this ban on visitations, the execution is still scheduled to proceed.

### B.     Plaintiffs' Intention To Attend The Rescheduled Execution.

Plaintiffs are family members of the victims in that case.  Earlene Branch Peterson is the mother of victim Nancy Mueller and the grandmother of victim Sarah Powell.  Kimma Gurel is Nancy Mueller's sister and Sarah Powell's aunt.  Monica Veillette is Nancy Mueller's niece and Sarah Powell's cousin.  Plaintiffs signed the Victims' Registration provided them at the time of trial, and indicated after being contacted by BOP that they intended to witness Lee's initial execution scheduled for December 2019.[18]  They were contacted again in

---

[16] https://www.bop.gov/coronavirus/covid19_status.jsp.

[17] *See* Federal Bureau of Prisons, USP Terre Haute, https://www.bop.gov/locations/institutions/thp/ (last visited July 10, 2020).

[18] Ms. Gurel and Ms. Veillette had made full arrangements to attend in December before the execution was stayed. Mrs. Peterson, who had just had heart surgery, did not.

June 2020. Both times the BOP liaison called to assist them with the logistics and costs of their attendance. Ms. Veillette has been the family's primary contact with the BOP liaison regarding those arrangements.

Mrs. Peterson is 81 years old and lives in Hector, Arkansas. Affidavit of Earlene Branch Peterson ("Peterson Affidavit") ¶ 1. She suffers from several conditions that the U.S. Centers for Disease Control and Prevention have recognized as placing her at high risk for COVID-19 complications, including congestive heart failure.[19] *Id.* ¶ 4. Mrs. Peterson has been advised by her doctor to remain at home and avoid personal contact with others to the extent possible during the pandemic. *Id.* ¶ 6. Although she travelled before the pandemic, she has not left her home county since February. *Id.* ¶ 5. In recent days, Arkansas has seen its largest daily increase in new COVID-19 cases and hospitalizations.[20]

---

[19] *People Who Need to Take Extra Precautions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited July 10, 2020).
[20] Scott Carroll, *Arkansas Logs Largest Daily Increase in COVID-19 Hospitalizations*, KATV (July 7, 2020), https://katv.com/news/local/arkansas-logs-largest-daily-increase-in-covid-19-hospitalizations; Daniel Breen, *School Start Date Delayed as Arkansas COVID-19 Cases, Hospitalizations Surge* (July 9, 2020),

Mrs. Peterson—as the mother, mother-in-law, and grandmother of the three victims in Lee's case—is, and has been, deeply invested in these proceedings. She attended Lee's capital trial on a daily basis. *Id.* ¶ 3. She has been contacted regularly over the years by members of the prosecution, who have updated her on the status of proceedings in the case. *Id.* ¶ 7. Mrs. Peterson "want[s] to attend this execution at a time when it is safe to travel," as she "hope[s] somehow by attending [she] can find some peace." *Id.* ¶¶ 14-15.

Ms. Gurel is 61 years old. Complaint ¶ 14. She lives in Spokane Valley, Washington, which is nearly 2,000 miles from Terre Haute. *Id.* As with Mrs. Peterson, her age and several underlying health conditions place her at increased risk for developing COVID-19-related complications. *Id.* She also attended Lee's capital trial on a daily basis. *Id.* ¶14.

Ms. Veillette is 43 years old and lives nearly 2,000 miles from Terre Haute, in Deer Park, Washington. Complaint ¶ 15. She suffers from asthma and other underlying conditions that put her at increased

---

https://www.ualrpublicradio.org/post/school-start-date-delayed-arkansas-covid-19-cases-hospitalizations-surge.

risk for developing COVID-19-related complications. *Id.* As a result, when informed of the present execution date, Ms. Veillette immediately expressed her concerns and reservations to the prison official about keeping her family safe during the pandemic. Affidavit of Monica Veillette, ¶ 6. She has been deeply invested in these proceedings, attended Lee's capital trial regularly, and testified as a witness for the prosecution. Complaint ¶ 15.

There are a "large number of individuals expected to be present at Lee's Execution." Decl. of Rick Winter, *Hartkemeyer v. Barr*, 2:20-cv-00336-JMS-DLP (Dkt. 51-1), ¶ 7. This includes an execution team of "approximately 40 BOP staff members." ¶ 10. Plaintiffs would be in contact with not only the BOP staff who will transport them from off-site to the grounds of the execution, but also the BOP staff who will escort them to FCC Terre Haute, through security, and to a staging area. *Id.* ¶ 11. Finally, those who choose to witness the execution are escorted to the witness room, where they will come in contact with two additional witnesses and an unspecified "small number of BOP staff." *Id.* ¶ 12.

### C.    Plaintiffs' Complaint And The District Court's Injunction.

On July 8, 2020, Plaintiffs brought this action for declaratory and injunctive relief. In their Complaint, they argued that Defendants had arbitrarily and capriciously selected an execution date. On July 10, 2020, the district court granted plaintiffs' motion for a preliminary injunction. The court first concluded that plaintiffs were likely to succeed on the merits. The court rejected the government's contention that the procedures for conducting executions is "committed to agency discretion by law," holding that the Federal Death Penalty Act (FDPA), incorporating "the law of the state in which sentence is imposed," 18 U.S.C. § 3596(a), constrains the government's discretion. Op. at 7-8.

The district court then rejected the government's contention that crime victims and their families are not within the "zone of interests" protected by execution procedures, and therefore are not permitted to sue under the APA. The court noted that under Arkansas law (incorporated by the FDPA) certain relatives of crime victims "shall be present" for the execution if they so choose. The court therefore held that plaintiffs have a strong likelihood of success on their claim that

12

they are "arguably within the zone of interests" Congress intended to protect.  *Id.* at 9.

The district court then held that Plaintiffs have a strong likelihood of success on their claim that the government's decision to schedule the execution date during a pandemic is arbitrary and capricious.  The court observed that the government had "produced no evidence to show that their decision to conduct an execution during a pandemic accounted for the victims' family's right to be present."  *Id*. at 11.  The court also held that the government's claim that plaintiffs have no right to attend the execution ignored Arkansas law giving family members such a right.  *Id*. at 10-11.

The court went on to find irreparable harm to the plaintiffs, noting that Mrs. Peterson would be "forced to choose whether being present for the execution of a man responsible for the death of her daughter and granddaughter is worth defying her doctor's orders and risking her own life."  *Id*. at 12.  And, while the government "has an interest in the prompt and orderly execution of Mr. Lee's death sentence," that "interest is intertwined with—and based in part upon— the victim's interest in timely justice."  *Id*.  Because the expressed

13

interest of at least three of those victims is in a safe, rather than immediate, execution, the balance of harms weighed in Plaintiffs' favor. *Id.* at 13.

## ARGUMENT

This court considers four factors in deciding whether to stay a district court's order pending appeal: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009); *Venckiene v. United States*, 929 F.3d 843, 853 (7th Cir.), *cert. denied*, 140 S. Ct. 379, 205 L. Ed. 2d 219 (2019).  The government cannot show that a stay is necessary here.

## I.     The Government Is Not Likely To Succeed On The Merits.

The district court correctly granted plaintiffs' request for a preliminary injunction.  "A party moving for preliminary injunctive relief need not demonstrate a likelihood of absolute success on the merits. Instead, he must only show that his chances to succeed on his claims are 'better than negligible.'"  *Whitaker By Whitaker v. Kenosha*

14

*Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1046 (7th Cir. 2017) (quoting *Cooper v. Salazar*, 196 F.3d 809, 813 (7th Cir. 1999). This standard "is a low threshold." *Id.* The district court correctly concluded that plaintiffs are likely to succeed on the merits here.

## A.    The Government's Decision is Subject to Judicial Review.

The Administrative Procedure Act contains "the strong presumption that Congress intends judicial review of administrative action." *Bowen v. Michigan Acad. of Family Physicians*, 476 U.S. 667, 670 (1986). While Congress provided an exception for action "committed to agency discretion by law," 5 U.S.C. § 701(a)(2), that is "a very narrow exception," *Heckler v. Chaney*, 470 U.S. 821, 830 (1985) (internal quotation marks omitted). The exception applies only if there is "no law to apply." *Id.* Moreover, "judicially manageable standards may be found in formal and informal policy statements and regulations as well as in statutes." *Id.* (*quoting Steenholdt v. FAA*, 314 F.3d 633, 638 (D.C. Cir. 2003) (internal quotation marks and citation omitted)).

The district court correctly rejected the government's argument that its decision to schedule Lee's execution—in the midst of a pandemic, potentially endangering the lives of participants, witnesses,

15

and the public in general—is committed to agency discretion and therefore unreviewable. While the Attorney General may have discretion to choose the date upon which the sentence is carried out, that discretion is not limitless.

First, the Federal Death Penalty Act (FDPA) states that an execution must proceed "in the manner prescribed by the law of the State in which the sentence is imposed." 18 U.S.C. § 3596(a). As the district court recognized, Arkansas law provides that victims' family members "shall be present" if they so choose. Ark. Code § 16-90-502(e)(1)(C). The government points to language in the statute that provides for "no more than six" family members shall be present (Motion at 14). But the fact that the clear entitlement to attend the execution is limited does not establish that there are no judicially manageable standards to apply.

The government is wrong in contending (Motion 13-14) that reliance on Arkansas law is inconsistent with *In re Bureau of Prisons Execution Protocol Cases*, 955 F.3d 106 (D.C. Cir. 2020). The controlling opinion in that case held that the federal government must follow execution procedures "set forth in state statutes and regulations, but

16

not execution procedures set forth in less formal state execution protocols." *Id.* at 112; *see id.* at 130 (Rao, J. Concurring).  The Arkansas provisions governing attendance of the victims' family members at executions are statutory, and thus constitute " the positive law and binding regulations of a state." *Id.* at 130 (Rao, J., concurring).

Even apart from Arkansas law, BOP's own regulations, as informed by its protocols, provide law to apply.  BOP regulations govern who "shall be present" at the execution.  *See* 28 C.F.R. § 26.4.  And the Federal Bureau of Prisons' Execution Protocol sets forth precisely who the citizen witnesses provided for in the regulation are intended to be: "in identifying these [eight citizen] individuals, the Warden, no later than 30 days after the setting of an execution date, will ask the United States Attorney for the jurisdiction in which the inmate was prosecuted to recommend up to *eight individuals who are victims or victim family members to be witnesses of the execution*)." *See* Exh. A to the Complaint ("BOP Protocol"), Ch. 1, III.G.1.c.(1), 10-11.  The government makes no effort to address the application of this protocol.

Finally, courts historically have played a role in setting execution dates; and they have recently done so, even after the death sentence

17

implementation regulations were promulgated. *See* Order Setting Execution Date, *United States v. Garza,* No. 1:97-cv-00273, Dkt. 18 (S.D. Tex. May 26, 2000); *see also United States v. Hammer*, 121 F. Supp. 2d 794, 796 (M.D. Pa. 2000) (noting court's setting of execution date, and reviewing claims pertaining to execution implementation). Indeed, both 28 C.F.R. § 26.3 and § 26.4 begin with "[e]xcept to the extent a court orders otherwise."  There is no reason why the courts cannot review the decision to schedule the execution in a manner that deprives plaintiffs of their right to attend.

### B.    *Plaintiffs Fall Within the Zone of Interests of the Statute.*

The Administrative Procedure Act permits an action to be brought by any party who is "adversely affected or aggrieved by agency action . . . ." 5 U.S.C. § 702.  Moreover, Congress intended to "make agency action presumptively reviewable" through the APA.  *Match–E–Be–Nash–She–Wish Band of Pottawatomi Indians v. Patchak,* 567 U.S. 209, 225 (2012).

Given the APA's presumption in favor of judicial review, the "zone of interests" test is "is not meant to be especially demanding."  *Patchak,* 567 U.S. at 225 (internal quotation marks omitted); *see Cook Cty.,*

*Illinois v. Wolf*, 962 F.3d 208, 211 (7th Cir. 2020).  A plaintiff need only be "*arguably* within the zone of interests" of the relevant statute, and "any doubt goes to the plaintiff."  *Patchak*, 567 U.S. at 225.  Thus, suit will be permitted unless the plaintiff's interests are "so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed" that Congress authorized the plaintiff to sue.  *Cook County*, 962 F.3d at 219.

Despite repeatedly stating that it was pursuing the execution of Lee on behalf of crime victims and their families (which include Plaintiffs), the government now argues that those victims have no interest in the matter.  But Plaintiffs are not outside meddlers.  As explained above, they have recognized interests and rights in both the criminal proceedings against Lee[21] as well as the execution of his sentence.

In particular, Arkansas law (as incorporated by the FDPA), provides that a spouse, parent, adult sibling, or adult child of the victim "shall be present" at the execution " if he or she chooses to be present."

---

[21] Crime victims, for instance, have extensive rights to participate in the underlying criminal proceedings.  *See* 18 U.S.C. § 3771.

Ark. Code, § 16-90-502(e)(1)(C).  That section covers both Mrs. Peterson and Ms. Gurel. And Arkansas law also recognizes the interests of "[a]ny other adult relative with a close relationship to the victim."  *Id.* § 16-90-502(e)(2)(D), (e)(1)(C).

It is therefore not surprising that plaintiffs have already been selected to attend this execution, as well as the previously scheduled December 2019 execution, pursuant to 28 C.F.R. § 26.4.  And, as noted above, BOP's Execution Protocol makes clear that the family members of crime victims must be among the "citizen" witnesses to the execution.

The government asserts (Motion at 14) that the Arkansas law does not permit "anyone" to "attend an execution at their preferred time" or require officials to "plan an execution around witness schedules."  But that says nothing about the right of family members to attend the execution.  And it ignores the question here: whether plaintiffs are arguably within the zone of interests of the statute.  The Arkansas statutes, along with BOP's regulations and protocols, are more than sufficient to bring them *arguably* within the zone of interests for the purposes of an APA challenge.

20

### C.    *Defendants' Decision was Arbitrary and Capricious, and Not In Accordance With Law.*

A reviewing court must "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  Agency decisions must be based on "reasoned decisionmaking." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 52 (1983).  Moreover, an agency must be able to provide the "essential facts upon which the administrative decision was based" and demonstrate that it based its decision on actual evidence beyond mere "conclusory statement[s]."  *United States v. Dierckman*, 201 F.3d 915, 926 (7th Cir. 2000) (*quoting Bagdonas v. Dep't of the Treasur*y, 93 F.3d 422, 426 (7th Cir. 1996)).

A agency decision is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Boucher v. United States Dep't of Agric.*, 934 F.3d 530, 547 (7th Cir. 2019).

The Attorney General's decision to schedule Lee's execution in the midst of a resurgent global pandemic is arbitrary and capricious. The Attorney General chose to schedule the first federal execution in 17 years at a time when it is not only dangerous to travel but goes against guidance from the federal government's own public health agency. At a time when the courts are not holding in-person proceedings and the lawyers with cases before those courts are working safely from home, the government presses ahead.

Defendants failed to consider the consequences of scheduling this execution in the midst of the most devastating global pandemic in the past century. Defendants' decision not only puts Plaintiffs at risk of a potentially fatal illness, it imposes the same grave risk on everyone Plaintiffs come into contact with, including the health care workers who routinely care for Mrs. Peterson.

The government points to safety measures that have been instituted for those who attend and participate in the execution. But at no point does the government address the risks of traveling to the execution. Indeed, the government's motion belittles plaintiffs' safety concerns by referring to their purported travel "preferences" and

22

supposed "willingness" to attend the execution. Motion, at 1. But plaintiffs are willing to attend the execution. As Mrs. Peterson stated, she prays daily for her lost daughter and granddaughter and hopes to find peace in attending. Dkt. 17-1, at 4. But attempting to travel from Arkansas—where COVID-19 cases currently are spiking—to Indiana for the execution will expose her to undue risk.

The government attempts to portray the district court's ruling as allowing any potential witness to dictate the Attorney General's choice of a date for an execution. The district court's ruling suggests nothing of the sort. All the court's decision requires is that the government consider the danger to close family members of the victims from traveling and attending an execution to which they have already been invited.

The safety measures touted by the government are of little comfort to plaintiffs. Not only do those measures fail to address the dangers of travel, but they are wholly insufficient to protect Plaintiffs, particularly in light of Plaintiffs' serious medical conditions. For instance, the Mr. Winter stated that FCC Terre Haute staff are required to undergo daily temperature checks and symptom screenings.

23

However, he specified no similar measures that will be taken with regard to the many others who will be present for Lee's execution, or to those who might be asymptomatic, and even stated that BOP had "no plans to conduct COVID testing on individuals involved in the execution in advance of the execution." *See id.* ¶7.

Nor can the government cannot reconcile the fact that BOP has suspended all visitation, including legal visits, at the FCC Terre Haute complex due to the dangers of COVID-19, with its decision to proceed with an event requiring an influx of people all at one time traveling from all over the country. The death toll from COVID-19 has significantly increased in the past few weeks; FCC Terre Haute is currently experiencing a known outbreak of the virus; and the country is now in the midst of another surge in infections that has caused numerous states to pause their reopenings and health experts to warn of the renewed risk of virus spread. It is arbitrary for Defendants to insist on a random date of execution that so clearly poses entirely unnecessary risks both on Plaintiffs and the broader public.

## II.     The Balance Of Equities Favors Plaintiffs.

The balance of harms in this case mandates injunctive relief until the pandemic abates.  The irreparable harm to plaintiffs is clear. Plaintiffs face the unacceptable choice between exercising their right to witness the execution and risking exposure to a deadly disease.  If they attend, they risk exposure to a disease that has already killed more than 130,000 people in the United States, and that currently is accelerating at an alarming rate.  The risk is particularly acute for Mrs. Peterson, whose age and medical condition significantly endanger her health should she be exposed to the virus.  Because plaintiffs cannot safely attend, if Lee's execution goes forward in the midst of this pandemic, plaintiffs will effectively be denied their right to be present.

The government dismisses the risk as "the mere 'possibility'" that Plaintiffs will be exposed to COVID-19 (Motion, at 19).  But the government is wrong when it says that the plaintiff must prove that it is "likely" they will be exposed to the virus.  The unacceptable risk of being exposed to a virus that is ravaging the United States, including the Federal Correctional Facility at Terre Haute, is an injury in itself.

25

In contrast, the government cannot show that it will suffer irreparable injury from postponing the execution of Lee while it appeals the district court's injunction or until it is safe for plaintiffs to attend. The government faces no deadline, nor can it articulate any significant damage from postponing the execution. There is no justifiable reason to carry out Lee's execution in the midst of a global, newly resurgent pandemic, when family members of the victims in the case, whose interests the government has recognized for twenty years cannot safely attend.

The government has pointed to its interest in carrying out the sentence. *See Bucklew v. Precythe*, 139 S. Ct. 1112, 1133 (2019) (the government has "an important interest in the timely enforcement of a sentence"). But the government fails to explain why that that interest requires the sentence to be carried out *now*, during a time of spiking COVID-19 cases. Indeed, the government has invoked the need for finality to benefit the victims and their families. And the Supreme Court has recognized that the government's interest in carrying out the sentence is based in part on the interest of the victims and their

26

families. *Bucklew*, 129 S. Ct. at 1133. That interest can be served once the families of the victims can safely travel and attend the execution.

### III. The Public Interest Favors Denial Of The Government's Motion.

The public interest also supports the district court's decision. The government has repeatedly invoked the interest of plaintiffs as a justification for carrying out Lee's execution. When the Attorney General announced Lee's current execution date, among others, he stated: "We owe it to the victims of these horrific crimes, and to the families left behind, to carry forward the sentence imposed by our justice system." *See* n. 1, *supra*. If the public interest in achieving closure for "the families left behind" is fostered by carrying out the sentence, that interest is undermined by scheduling the execution during a global pandemic that will not allow those families to attend without undue risk.

Carrying out the sentence threatens harm not just to families, but to the broader community. The government's action places at risk for infection and illness a broad population, including BOP staff, other witnesses of the execution, prisoners, and community members. It is not in the public interest to send travelers to a prison, where the virus

27

is known to quickly proliferate, and then back out into airports and hotels and their home communities and their families.  Delaying Lee's execution until a time when the perils of the COVID-19 pandemic have abated will not only protect those interests, it will also prevent grave, potentially fatal, health consequences to the Plaintiffs, family members in their care, and the general public.

## CONCLUSION

For the foregoing reasons, this Court should deny the government's motion for an emergency stay pending appeal.

Dated: July 11, 2020                    Respectfully submitted,


                                        */s/ Matthew M. Collette*
                                        Matthew M. Collette
                                        Kathryn A. Robinette
                                        MASSEY & GAIL LLP
                                        1000 Maine Ave SW, Suite 450
                                        Washington, D.C. 20005
                                        (202) 652-4511
                                        mcollette@masseygail.com
                                        krobinette@masseygail.com

                                        H. Baker Kurrus
                                        H. Baker Kurrus, PLLC
                                        10816 Crestdale Lane
                                        Little Rock, AR 72212
                                        Phone: (501) 831-0325
                                        Bkurrus@aol.com

                                        *Attorneys for Earlene Branch Peterson, Kimma Gurel, and Monica Veillette*

29

# CERTIFICATE OF SERVICE

I hereby certify that on July 11, 2020, I electronically filed the foregoing with the Clerk of the United States Court of Appeals for the Seventh Circuit using the CM/ECF system, thereby effecting service on counsel of record who are registered for electronic filing under Cir. R. 25(a).

Executed on July 11, 2020.

/s/ Matthew M. Collette
Matthew M. Collette

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION**

| | |
|---|---|
| EARLENE BRANCH PETERSON, KIMMA GUREL, and MONICA VEILLETTE,<br><br>Plaintiffs,<br><br>v.<br><br>WILLIAM P. BARR, in his official capacity as Attorney General of the United States; MICHAEL CARVAJAL, in his official capacity as Director of the Federal Bureau of Prisons; and T.J. WATSON, in his official capacity as Complex Warden for Terre Haute Federal Correction Complex,<br><br>Defendants. | Case No. 2:20-cv-00350-JMS-DLP |

**<u>AFFIDAVIT OF EARLENE BRANCH PETERSON</u>**

Earlene Branch Peterson, after being duly, sworn, hereby deposes and states as follows:

1.  My  name is Earlene Branch Peterson.  I am 81 years old, and reside in Hector, Arkansas.

2.  I am the mother of the late Nancy Mueller, and the grandmother of the late Sarah Elizabeth Powell.

3.  I attended every day of the trial of Daniel Lee in the federal

courthouse in Little Rock, Arkansas except for one day when I was so ill that I had to be hospitalized. I think about my daughter and granddaughter every day, and I pray for them every day. I am not at peace, and my prayer is that peace will come to me somehow when this is over.

4.  I am under the care of a doctor for a number of heart problems. I have had a heart attack that damaged my heart, and I have had open-heart surgery. I have congestive heart failure at this time, and I must take medications for my conditions. My doctor has advised me to remain at home and avoid personal contact with others due to the COVID-19 pandemic.

5.  I have not left my home county of Pope County, Arkansas, since I became aware of the COVID-19 pandemic sometime in February. In normal times I am able to travel, but during this pandemic I am not doing so.

6. I have been homebound since March 10, 2020, when I first became aware that COVID-19 was present in Arkansas. I have been advised by my doctor to be very careful about contact with others. I live with my son Paul Branch, and I have seen my sister, but I am limiting my contact with others. My neighbor who is a Certified Nursing Assistant has been getting my groceries and medicine for me and delivering these necessities to me at home. I am very fearful of the virus due to my age, my medical conditions, and the advice of my doctor. I bought a full tank of gas for my car on March 10, and my tank is still full because I have not been going out almost at all for four months.

7.  As victims in the Kehoe-Lee murder case, our family was given the opportunity to receive notices and updates regarding the status of the cases, and the punishment of the convicted.  My daughter Kimma Gurel, my niece Monica Veillette and I requested to be witnesses to the execution Daniel Lewis Lee set for December of 2019.  We were notified that we had been granted that right.  Monica helped with the arrangements with the people from the prison.

8.  Monica and Kimma made plans to go to the witness room at the prison.  I was not sure I wanted to do that, but I began to make plans to go to Terre Haute because I wanted to be with my family, and I was considering going to the prison. In the meantime I had a medical issue, and the execution was cancelled.

9.  When Danny Lee was scheduled to be executed in December, 2019, I was making plans to travel to Terre Haute.  Terre Haute, Indiana is about 580 miles from Hector, Arkansas.  My son Paul was planning to drive me to the prison.  Paul has multiple sclerosis. He is able to drive safely, but he and I are not able to make long trips in one day.  We planned to make the drive in two days, with one night of rest in a hotel along the way.  We planned to spend another night in Terre Haute, and then return home with another night's stay in a hotel.  This planning stopped when I had a medical problem, and when the execution was halted.

10. I was never asked by anyone from the prison or the government about my ability to travel to the execution scheduled for July  13, 2020.  If the pandemic were not going on I would go to the execution.  If I were to go now I would have to violate my doctor's orders to make the trip.  Paul and I would have to travel

by car across four states to Terre Haute to the prison there.  We would have to stop at least every two hours so I could walk because of my congestive heart failure.  We would also have to stop for gas and for meals. I would have to spend a total of three or four nights in hotels.  I would be exposed to the virus at all of these locations.  I would then be exposed at the prison to numerous people who are also in contact with other prisoners.  Monica told me that we would not be able to maintain social distance at the prison.  I could do these things during normal times, but not during the pandemic.

11. I feel as if my right to attend this execution was taken away from me when the date was set during the pandemic, which is getting worse.  I am now faced with an impossible choice of either not exercising my right to attend the execution, or traveling in dangerous conditions which could cause me to become very sick, or even die.

12. I want to attend this execution at a time when it is safe for people to travel.  Although I have some medical issues, I can travel if the conditions are not especially dangerous.

13. I pray every day for my lost daughter and granddaughter.  As a mother I feel very sorry for Daniel Lewis Lee's mother.  I hope somehow by attending I can find some peace.  Right now I am not at peace.


I declare under penalty of perjury that the foregoing is true and accurate.

Executed on July 9, 2020.


                                          /s/  Earlene Branch Peterson
                                         Earlene Branch Peterson

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**
**TERRE HAUTE DIVISION**

| | |
|---|---|
| EARLENE BRANCH PETERSON, KIMMA GUREL, and MONICA VEILLETTE,<br><br>                 Plaintiffs,<br><br>     v.<br><br>WILLIAM P. BARR, in his official capacity as Attorney General of the United States; MICHAEL CARVAJAL, in his official capacity as Director of the Federal Bureau of Prisons; and T.J. WATSON, in his official capacity as Complex Warden for Terre Haute Federal Correction Complex,<br><br>                 Defendants. | Case No. 2:20-cv-00350-JMS-DLP |

<u>**AFFIDAVIT OF MONICA VEILLETTE**</u>

Comes now Monica Veillette, who after being first duly sworn, deposes and states as follows:

1.  My name is Monica Veillette.  I am over the age of eighteen years, of sound mind, and reside in Spokane, Washington.

2.  My grandmother is Earlene Branch Peterson, who is the mother of the late Nancy Mueller.  My mother is Kimma Gurel, who is the late Nancy Mueller's sister.  Therefore, I am the niece of the late Nancy Mueller, and the cousin of the late Sarah Elizabeth Powell.

3.   As a family member of the victims in the murder case involving

Daniel Lewis Lee, I have had numerous interactions with the Bureau of Prisons in

connection with the planned executions of Daniel Lewis Lee.  I basically acted as

the family liaison to the Bureau of Prisons because I am more easily reached than

the others, and more technologically oriented than my mother or my grandmother.

4.   Our family registered with the federal Victim Notification

Program to receive notices and updates with respect to the crimes involving our

family.  When the first execution date for Daniel Lewis Lee was set, someone first

called my grandmother and told her about the upcoming execution.  She understood

that representatives of our family had the right to attend.

5.   My grandmother, my mother and I decided to go to Terre Haute.

We were all granted this right, and Mr. Steve Markle was the primary person who

worked with us regarding the arrangements for the trip. Although my grandmother

decided she probably did not want to be in the witness room, she did want to be

with our family in some place close by in Terre Haute.  The final arrangements

were never made because the execution was called off.  Although my grandmother

was involved in some of the discussions, I also began to be involved in the matters

relating to travel to the first execution.

6.   When the second execution date was set, Mr. Steve Markle called

me directly to discuss it. My grandmother I believe had also told him to contact me

about her arrangements.  I immediately expressed to him my concern about the

COVID-19 pandemic for my grandmother, my mother, and myself.  I believe my grandmother also did so with him directly.

7.  I have asthma, and am under a doctor's care for it.  I have medication for treatment of asthma.  When the pandemic started, my asthma specialist called me and warned me to be extremely careful during the pandemic.  She advised me to adhere to Washington's stay at home order.  She said that I should not travel, that I should avoid any crowds, and that I should always social distance.  I also have Centralized Sensitization Disorder (fibromyalgia).  Because of my health conditions I have not traveled during the pandemic, and I have been very careful in every way.  I always wear a mask in public places.  Even when I visit my mother I maintain social distance, wear a mask, and avoid any personal contact with her.

8.  Shortly after the second execution date was set I spoke with Mr. Markle several times.  I asked him very specifically about how my family could be protected when at the prison.  He told me that it would be impossible to maintain social distancing at the witness room, in the hallways, in the transport vans, at checkpoints and at other areas in the prison.

9.  I asked Mr. Markle to send me something in writing describing what measures the prison was going to take to keep me, my mother and my grandmother safe so I would be sure and could share that with my family.  I have not ever received anything from him or anyone else which gave me any assurances

regarding the safety of our family.  I specifically remember that Mr. Markle told me he could not send me anything in writing because it would be "discoverable."  I did not know what that meant.  When I asked him he said that anything he sent might be used in court, and therefore he could not send me anything.

10. I am likewise very concerned about travel from Spokane, Washington to Terre Haute during the pandemic. Spokane has recently had a big uptick in coronavirus cases. I know that my mother and I would have to fly from the Spokane airport first to a major airport, probably in Denver or California, and then change planes one or more times to get to Indianapolis.  I understood from Mr. Markle that we would then have a trip in a transport of some kind to get to Terre Haute.

11. The dangers to me and my family with respect to travel to Terre Haute, staying a hotel, riding in transports, being inside the prison, being in the witness room and the other areas are such that I and my family are being denied our rights to attend this execution.  I (like my family members) am being forced to make a choice between protecting my health by following my doctor's orders, or risking my health in order to assert my right to attend the execution which, by its very nature, will only happen once.

I declare under penalty of perjury that the foregoing is true and accurate.

Executed on July 9, 2020.          /s/ Monica Veillette
                                   Monica Veillette